J-S51021-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| RASHEEM D. DOWDY, | |
| Appellant | No. 1814 EDA 2015 |

Appeal from the Judgment of Sentence May 12, 2015
In the Court of Common Pleas of Delaware County
Criminal Division at No(s): CP-23-CR-0000160-2014

BEFORE:  BOWES and SHOGAN, JJ., and STEVENS, P.J.E.[*]

MEMORANDUM BY SHOGAN, J.:                    **FILED MARCH 29, 2018**

Appellant, Rasheem D. Dowdy, appeals from the judgment of sentence entered following his convictions of attempted homicide, robbery, robbery of a motor vehicle, aggravated assault, and carrying firearms without a license.[1]  We affirm.

The trial court presented the following detailed account of the factual and procedural history of this case:

> On Sunday January 22, 2012[,] at approximately 5:06 pm Ridley Township Police responded to a call for a gunshot victim at the Church's Chicken Restaurant located at 1936 West

---

[*]  Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 901 and 2502, 3701(a)(1), 3702(a)(1), 2702, and 6106, respectively.

McDade Boulevard in the Woodlyn Shopping Center in Woodlyn, Delaware County, Pennsylvania. (N.T. 8/14/2014, page 19).

The male victim, Mark L. Haas, was found bleeding on the floor with a gunshot wound to the chest. (N.T. 8/14/2014, page 19). He reported that he had arranged to sell twenty (20) juvenile ball python snakes for twelve thousand six hundred dollars ($12,600.00) to a man known to him as Kevin Walmberg with a cell phone number (404)621-[****].

After receiving a confirmatory message indicating Mr. Walmberg would be arriving at the pre-arranged location in 15 minutes, Mr. Haas left his vehicle, a black Toyota Rav 4 SUV vehicle, and entered the Church's Chicken Restaurant.

On returning to his vehicle, Mr. Haas heard a voice from behind say "throw down the keys" and Mr. Haas observed a black male pointing a gun at him who ordered him out of the car, [to] throw down his keys and turn over his cell phone and threatened to kill him.

Mr. Haas complied and left the driver's seat of his vehicle along with his keys, his cell phone and snakes. As he then ran around to the passenger side of the vehicle, the black male turned and shot at him from the driver's seat striking Mr. Haas in the chest and causing him to fall. The black male drove away in the vehicle containing the twenty (20) juvenile ball python snakes and Mr. Haas' cell phone.

Shortly thereafter, the police received a report of a reckless driver on Eastbound McDade Boulevard fleeing along Edgewood Avenue. (N.T. 8/14/2014, page 19).

The police discovered Haas' SUV abandoned on Edgewood Avenue with heavy front-end damage.

The police established a perimeter and deployed a K-9 unit to follow the fresh footprints in the snow from the abandoned SUV to the nearby wooded area.

While following the tracks in the snow the police first discovered a 9 mm Beretta handgun. The police also found a "Black Label" jacket sized XL with a Smith and Wesson 66 model

.357 Magnum revolver in the pocket. A scarf was also recovered from the jacket. (N.T. 8/14/2014, page 20).

The police processed the scene including hair samples from the interior of the SUV. A check on the Beretta handgun indicated it had been reported stolen in 2005. Police were able to match the bullet retrieved from the body of the victim, Mr. Haas, as being fired from the 9 mm Beretta recovered from the woods.

Detective Sargent William J. Henderson, Jr., a 27 year veteran of the Ridley Township Police Department, was the lead investigator assigned to the case. (N.T. 8/14/2014, page 16-17).

Police investigation connected [Appellant], to the cell phone number used to arrange the purchase of the snakes through an alias "Jermaine Harper" known to be used by [Appellant].

Based on the suspect's information, Detective Henderson developed a photo array line-up to determine if the victim would positively identify [Appellant] as his assailant. (N.T. 8/14/2014, page 24-25).

On February 28, 2012[,] the victim viewed the photo array line-up and immediately identified [Appellant] as the man who shot him from an eight (8) person photo array. (N.T. 8/14/2014, page 33).

Once the Appellant was positively identified, Detective Henderson put the Appellant's information into the NCIC database in an effort to locate the Appellant. He learned the Appellant was incarcerated in New York. (N.T. 8/14/2014, page 35).

Based on the results of the search, Detective Henderson prepared an affidavit of probable cause to seek a New York warrant to obtain a DNA sample from the Appellant. (N.T. 8/14/2014, pages 35-36).

Once the affidavit of probable cause was signed by a Magisterial District Judge in Pennsylvania it was forwarded to the King's County, New York District Attorney's office and

arrangements were made for Ridley Township Detectives and an FBI Special Agent to travel to King's County New York on March 6, 2012[,] and appear before a Judge in the King's County New York Supreme Court to obtain the search warrant for the DNA sample. (N.T. 8/14/2014, pages 35-36).

A Detective from King's County New York along with an assistant district attorney accompanied the Ridley Township Detectives and FBI agent to a hearing before the New York Supreme Court Judge who listened to the testimony in support of the search warrant and thereafter issued the search warrant for a sample of the Appellant's DNA. (N.T. 8/14/2014, pages 38-40).

None of the New York officials or law enforcement personnel indicated that either notice to the Appellant or a hearing at which the Appellant could challenge probable cause was a prerequisite to obtaining the search warrant or appearing before the Judge for a search warrant to collect the DNA sample. (N.T. 8/14/2014, pages 40). The detectives were then transported to the correctional facility to meet with the Appellant and collect a sample of his DNA. (N.T. 8/14/2014, pages 41-42).

The sample was collected with buccal swab which Detective Henderson placed into the Appellant's mouth and brushed back and forth seven (7) times on the side of his cheek. It was then packaged into an evidence bag and brought back to Pennsylvania. (N.T. 8/14/2014 page 42).

According to Detective Henderson the search warrant expressly permitted him to collect the DNA sample from the Appellant. (N.T. 8/14/2014, page 54).

Detective Henderson testified that since it was Ridley Township's case that they brought the evidence collection kit and it was in the best interest for a Ridley Township Detective to obtain the sample not a New York Detective due to chain of custody issues. (N.T. 8/14/2014, page 84).

As of the time the sample was collected there were no charges filed against the Appellant [in Pennsylvania]. (N.T. 8/14/2014, pages 45-46).

The charges in the Ridley Township case were actually filed and approved by a Magisterial District Judge [on] April 18, 2012. (N.T. 8/14/2014, page 46). As of the time of filing of the charges on April 18, 2012[,] Detective Henderson received confirmation there was a potential match on the Appellant's DNA. (N.T. 8/14/2014, page 46).

DNA swabs from the Appellant, the hairs from the vehicle, the DNA on the jacket, Beretta, Smith and Wesson, and scarf all matched [Appellant].

On April 18, 2012[,] a Ridley Township arrest warrant was issued for [Appellant] on charges of attempted criminal homicide and related offenses.

On April 18, 2012[,] the extradition unit of the Delaware County District Attorney's Office faxed the Ridley Township arrest warrant and list of charges to the New York State authorities housing the Appellant at the Brooklyn House of Detention.

The criminal complaint against [Appellant] was filed April 18, 2012.

The clerk from the Extradition Unit of the Delaware County District Attorney's Office, Teresa Robins, was informed by authorities in the State of New York that [Appellant] had pending local charges. (N.T. 6/25/15 p. 15, 1-6).

The Chief of the Extradition Unit of the Delaware County District Attorney's Office, Louis Stesis, Esquire, testified to his extensive experience in extradition and prisoner transfer matters and testified that the demanding jurisdiction cannot have custody of the prisoner where the prisoner has unresolved charges in the holding jurisdiction. (N.T. 7/15/14 p. 29, 1-5).

The Commonwealth produced the September 24, 2013 correspondence from the New York Governor's Office to the attention of Miriam Fonseca of the Office of Special Litigation of the New York County District Attorney's Office corroborating the testimony of Louis Stesis, Esquire pertaining to the transfer of custody of [Appellant] that "the accused is not to be surrendered to the agents of the demanding state on the Executive Warrant

and Agent Authorization if there are criminal charges pending against him in the State of New York."

The Commonwealth also offered the credible testimony of Teresa Robbins, the clerk of the extradition unit of the Delaware County District Attorney's Office, who also testified in her experience that when local charges are pending that fugitives are not released to a requesting jurisdiction. She further testified that New York State authorities advised her that they would notify her when the Appellant was available. (N.T. 6/25/14 p. 29, 11-19).

On January 26, 2012[, Appellant] had been charged in the Supreme Court of New York, Kings County, indictment number 581-12 with crimes against children including counts for [i]ncest in the first degree, criminal sexual act in the first degree, sexual abuse in the second degree, sexual misconduct and endangering the welfare of a child.

On July 24, 2013[, Appellant] entered a guilty plea to the charge of endangering the welfare of a child in New York State.

On July 30, 2013[,] New York State arrested [Appellant] as a fugitive and commenced extradition. (N.T. 6/25/14 p. 17, 21-25 & p. 18, 1-8). [Appellant refused to waive extradition.]

Thereafter[,] on August 27, 2013[,] the extradition unit of the Delaware County, Pennsylvania District Attorney's Office completed an application for Requisition to the Governor of the Commonwealth of Pennsylvania for a Governor's Warrant for the arrest of [Appellant]. (N.T. 6/25/14 p.19, 14-21). On September 10, 2013[,] the Governor of the Commonwealth of Pennsylvania issued a Requisition to the Governor of the State of New York for the arrest of [Appellant].

On September 13, 2013[,] the Governor of the State of New York issued an arrest warrant for [Appellant]. [New York authorities served the warrant on December 9, 2013.]

On December 9, 2013[,] the clerk of the extradition unit of the Delaware County District Attorney's Office forwarded a pick-up memo to the Office of the Sheriff of Delaware County for [Appellant].

On December 19, 2013[, Appellant] was preliminarily arraigned on charges in Delaware County including: criminal attempt to commit criminal homicide, possession of a weapon, aggravated assault (2 counts), recklessly endangering another person, terroristic threats with intent to terrorize another, robbery (2 counts), robbery - threatens immediate serious bodily injury, robbery of a motor vehicle, theft by unlawful taking - movable property, receiving stolen property (2 counts), unauthorized use of a motor vehicle, and firearms not to be carried without a license.

The Appellant's formal arraignment was scheduled for January 16, 2014. On June 19, 2014[,] the Appellant filed the instant motion to dismiss pursuant to Pa.R.Crim.P. Rule 600. The hearing on [Appellant's] Rule 600 Motion to Dismiss was conducted June 25, 2014[,] and continued [in order] to receive additional testimony on July 15, 2014. [Appellant's] Jury Trial proceeded on February 9, 2015[,] and concluded with a finding of guilt on [all charges on] February 12, 2015. [Appellant] was sentenced on May 12, 2015.

Trial Court Opinion, 12/22/16, at 1-9.

Specifically, the trial court sentenced Appellant to serve an aggregate term of incarceration of thirty-one to sixty-two years. This timely appeal followed. Both Appellant and the trial court have complied with Pa.R.A.P. 1925.

Appellant presents the following issues for our review:

Did the Trial Court err in denying [Appellant's] Motion to Dismiss the charges pursuant to Pennsylvania Rule of Criminal Procedure 600 for the Commonwealth's failure to bring him to trial within 365 days of the filing of these charges?

Did the Trial Court err in denying [Appellant's] Motion to Suppress DNA evidence which was obtained in violation of his statutory, common law and constitutional rights emanating from the laws of the United States, New York and Pennsylvania?

Appellant's Brief at 5.

Appellant first argues that the trial court erred in denying his pretrial motion filed pursuant to Pa.R.Crim.P. 600 when it refused to dismiss the charges due to the Commonwealth's failure to bring Appellant to trial within 365 days of the filing of the criminal complaint. Appellant's Brief at 13-20. Basically, Appellant contends that the Commonwealth failed to prove that it exercised due diligence in apprehending Appellant through the extradition process to bring him to trial in a speedy manner.[2]

Our review of a claim under Rule 600 is guided by the following principles:

> [O]ur standard of review of a trial court's decision is whether the trial court abused its discretion. Judicial discretion requires action in conformity with law, upon facts and circumstances judicially before the court, after hearing and due consideration. An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill will, as shown by the evidence or the record, discretion is abused.

_____

[2] In support of his Rule 600 claim, Appellant only argues that the Commonwealth failed to timely extradite him from New York. For the sake of completeness, we note that any additional delay was caused, in large part, by Appellant requesting a continuance and waiving Rule 600 on April 21, 2014 (the original trial date), and then again requesting a continuance and waiving Rule 600 on May 19, 2014. Appellant subsequently filed an omnibus pretrial motion seeking suppression of evidence on May 30, 2014, as well as a motion to dismiss under Rule 600 on June 19, 2014. After conducting hearings on both motions, the trial court finally resolved the motions on September 15, 2014. The time between April 21, 2014 and September 15, 2014 amounts to 147 days.

The proper scope of review is limited to the evidence on the record of the Rule [600] evidentiary hearing, and the findings of the [trial] court. An appellate court must view the facts in the light most favorable to the prevailing party.

Additionally, when considering the trial court's ruling, this Court is not permitted to ignore the dual purpose behind Rule [600]. Rule [600] serves two equally important functions: (1) the protection of the accused's speedy trial rights, and (2) the protection of society. In determining whether an accused's right to a speedy trial has been violated, consideration must be given to society's right to effective prosecution of criminal cases, both to restrain those guilty of crime and to deter those contemplating it. However, the administrative mandate of Rule [600] was not designed to insulate the criminally accused from good faith prosecution delayed through no fault of the Commonwealth.

So long as there has been no misconduct on the part of the Commonwealth in an effort to evade the fundamental speedy trial rights of an accused, Rule [600] must be construed in a manner consistent with society's right to punish and deter crime. In considering [these] matters . . . courts must carefully factor into the ultimate equation not only the prerogatives of the individual accused, but the collective right of the community to vigorous law enforcement as well.

**Commonwealth v. Plowden**, 157 A.3d 933, 936 (Pa. Super. 2017) (*en banc*) (quoting **Commonwealth v. Watson**, 140 A.3d 696, 697-698 (Pa. Super. 2016)).

As a general rule, the Commonwealth is required to bring a defendant to trial within 365 days of the date the complaint is filed. The version of

- 9 -

Rule 600 in effect at the time the criminal complaint against Appellant was

filed[3] stated, in relevant part, as follows:

**Rule 600. Prompt Trial**

* * *

(A)(2) Trial in a court case in which a written complaint is filed against the defendant, when the defendant is incarcerated on that case, shall commence no later than 180 days from the date on which the complaint is filed.

(3) Trial in a court case in which a written complaint is filed against the defendant, when the defendant is at liberty on bail, shall commence no later than 365 days from the date on which the complaint is filed.

* * *

(B) For the purpose of this rule, trial shall be deemed to commence on the date the trial judge calls the case to trial, or the defendant tenders a plea of guilty or *nolo contendere*.

(C) In determining the period for commencement of trial, there shall be excluded therefrom:

> (1) the period of time between the filing of the written complaint and the defendant's arrest, provided that the defendant could not be apprehended because his or her whereabouts were unknown and could not be determined by due diligence;

---

[3] We note that a new version of Rule 600 was adopted, effective July 1, 2013, "to reorganize and clarify the provisions of the rule in view of the long line of cases that have construed the rule." Pa.R.Crim.P. 600 cmt. However, because the criminal complaint in this case was filed on April 18, 2012, prior to the effective date of the new rule, we will apply the former version of Rule 600. The amendments to Rule 600 do not affect the result in this case.

\* \* \*

(3) such period of delay at any stage of the proceedings as results from:

(a) the unavailability of the defendant or the defendant's attorney;

(b) any continuance granted at the request of the defendant or the defendant's attorney.

Pa.R.Crim.P. 600.

In addition, the comment to Rule 600 provided, in relevant part, as

follows:

Under paragraph (C)(3)(a), in addition to any other circumstances precluding the availability of the defendant or the defendant's attorney, **the defendant should be deemed unavailable for the period of time during which** the defendant contested extradition, or **a responding jurisdiction delayed or refused to grant extradition**; . . . **or during which the defendant was absent under compulsory process requiring his or her appearance elsewhere in connection with other judicial proceedings**.

Pa.R.Crim.P. 600 cmt (emphases added).

Regarding the calculation of time for the commencement of a speedy

trial, we are mindful of the following:

The mechanical run date is the date by which the trial must commence under Rule 600. It is calculated by adding 365 days (the time for commencing trial under Rule 600) to the date on which the criminal complaint is filed. The mechanical run date can be modified or extended by adding to the date any periods of time in which delay is caused by the defendant. Once the mechanical run date is modified accordingly, it then becomes an adjusted run date.

***Commonwealth v. Lynn***, 815 A.2d 1053, 1056 (Pa. Super. 2003).

- 11 -

We have long stated the following with regard to a defendant's unavailability for trial:

> "It is generally held that Rule [600] is tolled where the Commonwealth shows, by a preponderance of the evidence, that it has acted with due diligence in seeking extradition to bring the defendant to trial. … The matters of availability and due diligence must be judged by what **was** done by the authorities rather than by what was not done." **Commonwealth v. DeMarco**, 481 A.2d 632, 636 (Pa. Super. 1984) (internal citations omitted) (emphasis in original). Under Rule 600(C)(1), time between the filing of the complaint and a defendant's arrest may be excluded from calculation of the trial commencement period, provided the defendant could not be apprehended because his whereabouts were unknown and could not be determined by due diligence. **Commonwealth v. Ingram**, 591 A.2d 734, 737 (Pa. Super. 1991), *appeal denied*, 530 Pa. 631, 606 A.2d 901 (1992). In addition, the Comment to Rule 600 states a defendant is deemed unavailable during the time a responding jurisdiction delays or refuses to grant extradition. **See** Rule 600 Comment, **supra**.

**Commonwealth v. McNear**, 852 A.2d 401, 406 (Pa. Super. 2004). In addition, we have also explained the following:

> A criminal defendant who is incarcerated in another jurisdiction is unavailable within the meaning of Rule 600 if the Commonwealth demonstrates by a preponderance of the evidence that it exercised due diligence in attempting to procure the defendant's return for trial. Due-diligence is a fact-specific concept that is determined on a case-by-case basis. Due diligence does not require perfect vigilance and punctilious care, but rather a showing by the Commonwealth that a reasonable effort has been put forth.

**McNear**, 852 A.2d at 404 (citations and quotation marks omitted).

Our review of the record reflects that the criminal complaint in this matter was filed on April 18, 2012. Therefore, the mechanical run date for the start of Appellant's trial was April 18, 2013. Appellant's trial did not

commence until February 9, 2015, which was 1,027 days after the filing of the criminal complaint and 662 days after the expiration of the mechanical run date. Nevertheless, there were circumstances beyond the Commonwealth's control, *i.e.*, Appellant's unavailability due to compulsory process requiring his appearance in New York in connection with other judicial proceedings, which resulted in the delay of Appellant's trial and resulted in an adjusted run date.

In addressing this issue, the trial court offered the following apt analysis:

> The unrebutted credible evidence is that the State of New York would not transfer or otherwise release the Appellant to the custody of the Commonwealth of Pennsylvania until the Appellant's New York State charges were resolved. Additionally, the evidence shows New York State did not raise the issue of extradition until after July 24, 2013[,] despite the diligence of the Delaware County Extradition Unit in notifying the authorities there on April 18, 2012 of [the] Commonwealth's willingness to extradite the Appellant.
>
> Further, the credible testimony of the Delaware County District Attorney's Extradition Unit was that the holding state will not release a prisoner until local charges are resolved. The Commonwealth is not required to perform repeated fruitless acts where New York State would not release the Appellant until the charges there were resolved. The Commonwealth has no control over the delay in raising extradition attributable to New York State authorities.
>
> The Commonwealth met the burden of showing by a preponderance of the evidence that due diligence was exercised in obtaining the Appellant's presence for trial and that the circumstances occasioning the delay were beyond the control of the Commonwealth. Further, pursuant to Pa.R.Crim.P. Rule 600 the Appellant was unavailable for trial between April 18, 2012 and December 19, 2013[,] and these six hundred and eleven

days (611) are excludable delay not chargeable against the Commonwealth.

Trial Court Opinion, 12/22/16, at 16-17. We agree with the trial court's conclusion.

Our review of the record reflects that at the Rule 600 hearing, Teresa Robins, the coordinator for the extradition unit of the Delaware County District Attorney's Office, testified regarding her efforts to secure Appellant's return from New York. N.T., 6/25/14, at 5-51. Ms. Robins's testimony indicated the timeline of the extradition process in this case, as well as her general experience as the extradition coordinator. The instant crime was committed on January 22, 2012, and the criminal complaint was filed by the Ridley Township Police Department on April 18, 2012. N.T., 6/25/14, at 10. In the interim, on February 7, 2012, Appellant was arrested in New York and was charged with committing a sexual crime in New York. *Id*. at 16. Ms. Robins received from the Ridley Township Police a copy of the warrant for Appellant's arrest on April 19, 2012. *Id*. at 11. Also on that date, Ms. Robins faxed to the Brookland House of Detention in New York a copy of the warrant and a cover letter explaining that the Commonwealth was seeing extradition of Appellant.[4] *Id*. at 11-13. Ms. Robins testified that New York

_____

[4] Along with other details, the letter contained the following language:

> Please be advised that we will extradite the above named individual. We ask you to notify our department of the

*(Footnote Continued Next Page)*

- 14 -

authorities informed her that Appellant had pending charges and was not available. *Id*. at 15. She also indicated that she was notified by the New York authorities that she would be contacted when Appellant was available to be transferred to Pennsylvania. *Id*.

Specifically, the following transpired at the Rule 600 hearing regarding Ms. Robins's contact with New York authorities concerning Appellant:

> [COMMONWEALTH]: Ms. Robins, were you given any information from the New York authorities in regards to [Appellant's] status in New York?
>
> [MS. ROBINS]: Yes. [Appellant] had local charges in which [the Commonwealth] could not have him if -- while [Appellant] has matters in the other state.
>
> [COMMONWEALTH]: Okay. And were you further notified by the New York authorities that you would be contacted when he was available to be transferred to Pennsylvania?
>
> [MS. ROBINS]: Yes.

N.T., 6/25/14, at 15.

Ms. Robins stated that, in her experience as the extradition coordinator, when a defendant has pending charges in another jurisdiction the defendant is not available for extradition until the pending matter is

_(Footnote Continued)_ ─────────

> willingness of the fugitive to waive extradition or the refusal to waive extradition and the need to make application for a Governor's Warrant. Please lodge our request as a detainer.

N.T., 6/25/14, at 11.

completed. *Id*. at 16. She further expressed that she has never received a fugitive while local charges were pending in another jurisdiction.[5] *Id*. at 17.

Ms. Robins also testified as follows regarding the Commonwealth's decision not to proceed further with the extradition process:

[COMMONWEALTH]: The time between April 19, 2012, to July 25, 2013, why didn't you proceed with extradition of the fugitive back to the Commonwealth of Pennsylvania?

[MS. ROBINS]: I wait[ed] for the other, in this case New York, to notify me as [of] the status of the person that we want. They always notify me what they need or when the person's available and then I do what I do what they instruct me to do so . . .

[COMMONWEALTH]: Were you ever told during that time period that [Appellant] was available?

[MS. ROBINS]: No.

[COMMONWEALTH]: And why?

[MS. ROBINS]: He had matters there in New York that he needed to take care of first.

N.T., 6/25/14, at 26-27.

Ms. Robins offered the following testimony pertaining to her understanding and contact with the New York authorities and Appellant's availability to be extradited to Delaware County:

_____

[5] Ms. Robins specifically testified that she was not able to seek extradition pursuant to the Interstate Agreement on Detainer ("IAD"), 42 Pa.C.S. § 9101, *et seq*., because Appellant had not yet been sentenced for a crime in New York. N.T., 6/25/14, at 30.

[COMMONWEALTH]: What was your understanding as to whether or when [Appellant] would be available for extradition back to the Commonwealth of Pennsylvania?

[MS. ROBINS]: I just -- and like during that time it was my understanding that [Appellant] was, you know, there to handle his matters and that I would be notified at the next step when, you know, he would be finished there. Like and I had no -- in that time period I have no notification and often it takes some time because continuances and things and periods...

[COMMONWEALTH]: And it's been your experience when there's local charges pending are fugitives ever released to the Commonwealth of Pennsylvania, Delaware County?

[MS. ROBINS]: No, not when they have a pending case.

[COMMONWEALTH]: And you had conversations with the New York authorities that you would be notified when he was available. Correct?

[MS. ROBINS]: Yes.

N.T., 6/25/14, at 29.

In addition, the trial court heard testimony from Assistant District Attorney Louis Stesis, who is the chief of the extradition unit of the Delaware County District Attorney's Office. N.T., 7/15/14, at 6-55. Mr. Stesis indicated that the extradition process is initiated by his office with the lodging of a detainer. *Id*. at 12, 14-15. Also, Mr. Stesis confirmed the testimony of Ms. Robins that when a defendant has pending charges in another jurisdiction, the defendant is not available for extradition until the pending matter is completed. *Id*. at 28-29. This testimony that New York authorities refused to extradite Appellant while New York charges were pending was corroborated by a letter from Carol D. Swan, the New York

State Governor's Office extradition specialist, which was sent to the commissioner of the New York City Police Department and was attached to the Governor's Warrant. Letter, 9/24/13, at 1-2 (Commonwealth Exhibit-5).[6]

---

[6] The text of the New York letter provides, in pertinent part, as follows:

> I have enclosed Governor Cuomo's Executive Warrant & Agent authorization and supporting documents authorizing the surrender of [Appellant] to agents of the Commonwealth of Pennsylvania.
>
> On behalf of Governor Cuomo, please be advised [Appellant] is not to be surrendered to the agents of the demanding state on the Executive Warrant & Agent Authorization if there are criminal charges pending against him in the State of New York. In accordance with New York Criminal Procedure Law Section 570.44, Governor Cuomo has the discretionary authority to hold the accused pursuant to the Executive Warrant & Agent Authorization pending completion of trial proceedings or his conviction and punishment in this state before surrendering him on the requisition of the executive authority of the demanding state.
>
> Furthermore, the accused is not to be surrendered to agents of the demanding state if the criminal charges pending against him result in his commitment to the New York State Department of Corrections and Community Supervision (DOCCS). If the charges result in a DOCCS sentence, the fugitive matter should be dismissed and the Executive Warrant & Agent authorization and related documents returned to me at the above address. Agents of the demanding state may obtain custody of the accused pursuant to the Interstate Agreement on Detainers (CPI Section 580.20) or wait until he is discharged from his sentence and available for surrender.

*(Footnote Continued Next Page)*

The record also reflects that Ms. Robins explained that Appellant ultimately pled guilty to charges in New York on July 24, 2013. N.T., 6/25/14, at 17. On July 25, 2013, the Pennsylvania warrant was again faxed to New York authorities. *Id*. at 18. On July 30, 2013, New York started the next level of the extradition process, but Appellant refused to waive extradition on that date. *Id*. at 18-19. Ms. Robins testified that she was informed on August 3, 2013, that Appellant had been transferred from Brookland to Manhattan. *Id*. at 18. On August 27, 2013, Ms. Robins mailed a request for a Governor's Warrant to Harrisburg. Thereafter, the Governor's office in Harrisburg sent a Governor's Warrant to New York authorities on September 10, 2013. *Id*. at 20. The Governor's Warrant ultimately was served upon Appellant by New York authorities on December 9, 2013. *Id*. at 20-21. Also on December 9, 2013, upon being notified that the Governor's Warrant had been served upon Appellant, Ms. Robins issued a memo to the Delaware County Sheriff's Office with instructions on retrieving Appellant in New York. *Id*. at 21. Thereafter, Appellant was returned to Pennsylvania and proceeded to a preliminary arraignment on December 19, 2013. *Id*. at 22.

*(Footnote Continued)* ————————

> If the accused receives a local sentence, he should be surrendered upon satisfaction of sentence. If the charges result in an acquittal or dismissal, he may be surrendered at that time.

Letter, 9/24/13, at 1.

Thus, the record reflects that the Commonwealth acted with due diligence in seeking Appellant's return once he fled to New York, committed a crime in that jurisdiction, was held in New York pending resolution of that judicial process, and subsequently refused to waive extradition. Appellant's contrary claim that the Commonwealth did not act with due diligence in securing Appellant's return from New York is belied by the record. Hence, his claim in this regard lacks merit.

Appellant next argues that the trial court erred in denying his motion to suppress evidence. Appellant's Brief at 21-25. Specifically, Appellant claims that the trial court should have suppressed his DNA evidence that was obtained while Appellant was an inmate in New York. Appellant alleges that his DNA was acquired in violation of New York law and therefore must be suppressed. *Id*. at 22-24. Appellant presents the following argument in this regard:

> Under New York law, the Due Process Clauses of the United States and New York Constitutions require that, absent exigent circumstances, a suspect must be provided with notice that an application to procure a DNA sample has been made and an opportunity to appear before a court to contest the People's application. *People v. Smith*, 940 N.Y.S.2d 373, 377 (4th Dep't 2012); *People v. Fomby*, 956 N.Y.S.2d 633, 635 (3rd Dep't 2012); *See* U.S. Const. Amend. XIV; N.Y. Const. Art. I, Sec. 6. Furthermore, the New York Supreme Court has held that in cases where Due Process is not provided prior to the issuance of a search warrant for a DNA sample, any evidence resulting from the search must be suppressed. *Id*.
>
> The testimony of Officer Henderson indicates that acquiring the warrant did not comply with the law of the state of New York. [Appellant] was not provided with notice that an

application for a search warrant to procure a DNA sample was being made, nor was he provided any opportunity to contest the application in court prior to the warrant being issued or executed. (N.T. 8/14/15 at 50-51) [Appellant] was given no consent form to the DNA, nor was he informed of his right to refuse or his right to contest the warrant. (N.T. 8/14/15 at 56-57) Accordingly, the issuance and execution of the search warrant violated his rights under the Due Process Clauses of the New York and United States Constitutions and must be suppressed.

*Id*. at 22-23. Upon thorough review of the law and the facts of this case, we determine that Pennsylvania law applies.

With respect to an appeal from the denial of a motion to suppress, our Supreme Court has stated the following:

Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. When reviewing the ruling of a suppression court, we must consider only the evidence of the prosecution and so much of the evidence of the defense as remains uncontradicted when read in the context of the record. . . . Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error.

*Commonwealth v. Eichinger*, 915 A.2d 1122, 1134 (Pa. 2007) (citations omitted). Moreover, we note that our scope of review from a suppression ruling is limited to the evidentiary record that was created at the suppression hearing. *In re L.J.*, 79 A.3d 1073, 1087 (Pa. 2013).[7]

_____

[7] On October 30, 2013, our Supreme Court decided *In re L.J.*, holding that our scope of review from a suppression ruling is limited to the evidentiary record that was created at the suppression hearing. *L.J.*, 79 A.3d at 1087.
*(Footnote Continued Next Page)*

In addition, the decision to admit or exclude evidence is committed to the trial court's sound discretion, and its evidentiary rulings will only be reversed upon a showing that it abused that discretion. ***Commonwealth v. Laird***, 988 A.2d 618, 636 (Pa. 2010). Such a finding may not be made "merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous." ***Id***. (quoting ***Commonwealth v. Sherwood***, 982 A.2d 483, 495 (Pa. 2009)).

Further, we are aware that Pa.R.Crim.P. 581, which addresses the suppression of evidence, provides in relevant part as follows:

> (H) The Commonwealth shall have the burden . . . of establishing that the challenged evidence was not obtained in violation of the defendant's rights.

Pa.R.Crim.P. 581(H).

*(Footnote Continued)* ─────────────

Prior to ***L.J.***, this Court routinely held that, when reviewing a suppression court's ruling, our scope of review included "the evidence presented both at the suppression hearing and at trial." ***Commonwealth v. Charleston***, 16 A.3d 505, 516 (Pa. Super. 2011) (quoting ***Commonwealth v. Chacko***, 459 A.2d 311 (Pa. 1983)). ***L.J.*** thus narrowed our scope of review of suppression court rulings to the evidence presented at the suppression hearing. In this case, Appellant's suppression hearings were held after ***L.J.*** was decided. Therefore, the rule announced in ***L.J.*** applies to the case at bar. ***See L.J.***, 79 A.3d at 1089 (stating holding applies to "all litigation commenced Commonwealth-wide after the filing of this decision").

Concerning issues that present a conflict of law, our Supreme Court has instructed as follows:

> The Pennsylvania approach to conflict of law issues varies depending upon whether the laws are procedural or substantive in nature.[10]  Pursuant to **Commonwealth v. Sanchez**, 552 Pa. 570, 716 A.2d 1221 (1998), where a conflict of law arises regarding procedural matters, Pennsylvania will apply its procedural laws when it is the forum state.  **Id.**, at 1223. However, where a conflict exists regarding substantive laws, such as here, "Pennsylvania courts take a flexible approach which permits analysis of the policies and interests underlying the particular issue before the court." **Id.** "This approach gives the state having the most interest in the question paramount control over the legal issues arising from a particular factual context, thereby allowing the forum to apply the policy of the jurisdiction most intimately concerned with the outcome." **Id.**, at 1223–[12]24.
>
> > [10] "As a general rule, substantive law is that part of the law which creates, defines[,] and regulates rights, while procedural laws are those that address methods by which rights are enforced." **Payne v. Commonwealth Department of Corrections**, 582 Pa. 375, 871 A.2d 795, 801 (2005) (citations omitted).

**Commonwealth v. Housman**, 986 A.2d 822, 841-842 (Pa. 2009).

A substantive right is defined as a right to equal enjoyment of fundamental rights, privileges and immunities, as distinguished from a procedural right.  **Sanchez**, 716 A.2d at 1224.  By contrast, procedural law is that which prescribes the methods of enforcing rights or obtaining redress for their invasion; this is distinguished from the substantive law which gives or defines the right.  **Id**.  Because the issue before us involves the constitutional protections regarding searches and seizures, this issue must

- 23 -

be addressed under the principles of conflict between substantive laws, which requires this Court to evaluate which state has the most interest in the outcome.

In **Sanchez**, a canine sniff of a package in California, which was sent to a Pennsylvania resident, gave rise to the probable cause necessary for issuance of a Pennsylvania search warrant. The canine sniff was legal under California law but not Pennsylvania law. **Sanchez**, 716 A.2d at 1222-1223. The **Sanchez** Court concluded that California possessed the greater interest in the validity of a canine sniff and, because the sniff complied with California law, it could be used to support probable cause in Pennsylvania. **Sanchez**, 716 A.2d at 1224. The **Sanchez** Court further held that no Pennsylvania state interest would be advanced by analyzing the propriety of the canine sniff under Pennsylvania law because the canine sniff did not occur in Pennsylvania and **no Pennsylvania state officer was involved in the canine sniff**. The Court in **Sanchez** concluded by holding "that if the courts of a sister state determine that a canine sniff is not a search in that state the propriety of a sniff **initiated by that state's officers** and conducted within that state's boarders must be evaluated under the laws of that state." **Sanchez**, 716 A.2d at 1225 (emphasis added).

In the case *sub judice*, we agree with the trial judge that Pennsylvania law governs. The victim of the robbery and shooting was a Pennsylvania resident, Appellant is a Pennsylvania resident, the crime was initiated in a

vehicle registered in the Commonwealth of Pennsylvania, and the crimes occurred in Pennsylvania. The Ridley Township Police Department investigated the crimes in this matter. The original affidavit of probable cause requesting a search warrant for DNA evidence to be taken from Appellant was signed by both a detective of Ridley Township Police Department and a Pennsylvania Magisterial District Judge. Appellant was ultimately charged with violations of the Pennsylvania Crimes Code. Here, as the trial court observes, Pennsylvania possessed the greater interest than New York. Trial Court Opinion, 12/22/16, at 23. Consequently, the trial court did not err in applying Pennsylvania law and refusing to suppress Appellant's DNA evidence due to alleged violations of New York law.

In addition, Appellant contends that the DNA evidence should have been suppressed under Pennsylvania law because the search was conducted without a search warrant validly issued within Pennsylvania. Appellant's Brief at 24. Appellant asserts that a Pennsylvania police officer exceeded his authority when he obtained a New York warrant to take Appellant's DNA sample while Appellant was an inmate in a New York criminal facility.[8] *Id*. at 24-25. This allegation lacks merit.

As we previously observed, Pennsylvania will apply its procedural laws when it is the forum state. *Sanchez*, 716 A.2d 1223. The relevant

_____

[8] Appellant does not allege that the search warrant was not supported by probable cause.

Pennsylvania Rule of Criminal Procedure provides as follows: "[a] search warrant may be issued by any issuing authority within the judicial district wherein is located either the person or place to be searched." Pa.R.Crim.P. 200. This Rule authorizes Pennsylvania courts to issue a warrant where it has jurisdiction over "the place or person to be searched." *Id*. Consequently, police officers are to obtain warrants from the jurisdiction where the person, places, or effects to be searched or seized are located. Moreover, in Pennsylvania proceedings, we have held that police may use evidence seized pursuant to a warrant obtained through the cooperation between Pennsylvania police and a neighboring jurisdiction. *See, e.g., Commonwealth v. Corbo*, 440 A.2d 1213, 1215 (Pa. 1980) (reversing order granting suppression of evidence resulting from a search of the appellees' place of business, where the Commonwealth secured the Pennsylvania search warrant through affidavits supported by information received from the New Jersey State Police). In addition, we observe that our Supreme Court has long held that the requirement "that the officers serving the warrant have territorial jurisdiction at the place of the search, is wrong." *Commonwealth v. Mason*, 490 A.2d 421, 427 (Pa. 1985). "[Pennsylvania] Rule [of Criminal Procedure 204] provides, clearly and simply, that a search warrant shall be served by *a law enforcement officer*. The comment to the rule provides that '*[n]o specific person need be designated* in the warrant. However, only *a law enforcement officer* can properly serve a search

warrant.'" **Id**. (emphases in original). In addition, our Supreme court has explained the following:

> [E]ven were we to agree [that Rule 204] required that a law enforcement officer having primary jurisdiction in the place where the search is to take place actually "participate" in the service of the warrant, we would not hesitate to find that requirement met in the instant case because of the presence of "jurisdictional police officers" . . . at [the place searched]. The distinction recognized by the Superior Court, between searches wherein "jurisdictional police" participate in the search "regardless of the degree of participation" and searches wherein "jurisdictional police" are "merely" present at the scene, is artificial; their presence is certainly sufficient to constitute "actual participation."

**Mason**, 490 A.2d at 427. **See also Commonwealth v. Kunkel**, 408 A.2d 475, 476-477 (Pa. Super. 1978) (reversing order granting motion to suppress where search warrant was not defective because police officers were acting beyond the scope of their jurisdiction).

In addressing Appellant's concern, the trial court offered the following discussion:

> The relevant Pennsylvania Rule of Criminal Procedure pertaining to issuance of a search warrant states: "a search warrant may be issued by any issuing authority within the judicial district wherein is located either the person or place to be searched." **See** Pa.R.Crim.P. 200. The statute plainly authorizes Pennsylvania courts to issue a warrant where it [has] jurisdiction over "the place or person to be searched." **Id**. Because the police officers must obtain warrants from the jurisdiction where the person, places, or affixed to be searched or seized or located. **See Id**.; [s]ee **also Commonwealth v. Ryan**, 400 A.2d 1264, 1268 (Pa. 1979). Just as in **Commonwealth v. Corbo**, 440 A.2d 1213, 1215 (Pa. 1980)[,] where it was held officers may use evidence seized pursuant to a warrant obtained through the cooperation among officers in Pennsylvania and New Jersey in Pennsylvania proceedings[,]

here, by analogy[,] officers of Pennsylvania may use evidence seized pursuant to a warrant obtained through cooperation among officers in New York.

In this case, Ridley Township police worked with law enforcement outside of Pennsylvania because Appellant was incarcerated in New York at the time. The assistance of New York police was necessary to obtain and execute the search warrant. *See Commonwealth v. Kunkel*, 408 A.2d 475, 476-[4]77 (Pa. Super. 1978).

Trial Court Opinion, 12/22/16, at 20-21.

Upon review of the certified record, we conclude that there was no violation of Pennsylvania procedural law in the issuance and execution of the search warrant to secure Appellant's DNA. Here, it is undisputed that the Ridley Township police worked with officials outside of the Commonwealth because Appellant was incarcerated on pending charges in the state of New York. Commonwealth Exhibit #CS-4, 8/14/14, Affidavits of Probable Cause dated 3/1/12 and 3/6/12. The assistance of New York police was necessary in procuring and executing a valid New York search warrant, which was where Appellant was incarcerated. Commonwealth Exhibit #CS-4, 8/14/14, New York Search Warrant. It is further undisputed that New York police accompanied the Ridley Township police officer to execute the search warrant and to secure the DNA sample. Accordingly, we are satisfied that there was no violation of Pennsylvania procedural law and the results of Appellant's DNA testing were properly admitted under Pennsylvania law.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/29/18